UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

UNITED STATES OF AMERICA,

        Plaintiff,

   v.

MELODI FAE HARRIS,

        Defendants.

NO. 2:06-cr-0107 FCD

MEMORANDUM AND ORDER

----oo0oo----

    This matter is before the court on defendant Melodi Fae Harris' ("Harris" or "defendant") motion to suppress statements made to law enforcement officers during the search of her home on November 15, 2005. Defendant is charged in the indictment with five counts of mailing threatening communications through the United States Postal Service and three counts of transmitting threats by interstate communication via e-mail. (Indictment [Docket #1], filed Mar. 23, 2003). An evidentiary hearing was held on August 24, 2007. Thereafter, the court requested supplemental briefing. Having reviewed the file herein and heard the testimony of witnesses and arguments of counsel, the court DENIES defendant's motion to suppress.

## BACKGROUND[1]

On November 15, 2003, CHP officer Brian Maynard ("Maynard") and United States Postal Inspector Paul Richard ("Richard") (collectively, the "officers") served a search warrant on defendant Harris at her residence. (Tr. 3-4). Prior to this date, Maynard had investigated Harris for months. (Tr. 27). Harris had no observable criminal history or record of prior arrests. (Tr. 27). There was some confusion as to when defendant left for and how she commuted to work. (Tr. 30). Based upon this concern, the officers arrived early to serve the search warrant and avoid breaking down defendant's door. (Tr. 30-31).

The search warrant authorized service anytime before 6:00 a.m. as long as it was after 5:00 a.m. (Tr. 4). Maynard and Richard arrived at the residence at approximately 5:00 a.m. and parked by the entrance of defendant's apartment complex. (Tr. 4). They were parked in an unmarked dark blue Ford Excursion. (Tr. 4). Neither Maynard nor Richard were in uniform. (Tr. 5). Maynard wore a sweatshirt, displayed a badge on a chain around his neck, had his handcuffs hanging from his belt at the small of his back, and carried a concealed gun on his right-hand side in a holster. (Tr. 32-33). Richard wore jeans and a shirt, displayed a badge on his hip clipped to his belt, had his handcuffs tucked inside his belt and half-visible from the outside, and carried a concealed gun on his hip. (Tr. 48-49). The approximately four

---

[1] The facts are taken from the evidence received at the evidentiary hearing held on August 24, 2007. (Rep.'s Tr. of Evidentiary Hr'g on Def.'s Mot. to Suppress ("Tr.") [Docket #34], filed Sept. 4, 2007).

2

other officers that were present to help execute the search warrant were parked down the street and out of view.  (Tr. 4; 29).[2]

Maynard testified that he and Richard were hoping to speak to Harris that day to obtain some insight into possible motives and to elaborate on the information they already had.  (Tr. 9-10).  Maynard also testified that the "game plan" was to see if Harris would speak to them voluntarily, execute the search warrant, and then leave the premises, allowing plaintiff to "go about her business."  (Tr. 10).  He further stated that if defendant Harris declined to speak to him or Richard, the interview would have ended.  (Tr. 34).

At approximately 5:30 a.m., Maynard and Richard observed Harris exiting her apartment.  (Tr. 5-6).  After they saw her lock the door, they exited their vehicle and made contact with defendant about 40 feet from her doorway.  The officers identified themselves and told Harris that they would like to talk to her about some threatening letters and some e-mails that had been sent to the Employment Development Department ("EDD").  (Tr. 6).  Harris indicated that she was familiar with the incidences, that she had heard letters had been sent to the office, and that she had heard they had been sent by a former employee.  (Tr. 6).  The officers again expressed their desire to talk to Harris, and she indicated that she understood.  (Tr. 6, 33).  At that point, Harris turned and walked back to her

---

[2] Officer Richard testified that there may have been one unmarked car from earlier surveillance still in the parking lot of the apartment complex.  (Tr. 47).

3

residence with the officers.  (Tr. 6-8).

Harris unlocked the door to the apartment and invited the officers in.  (Tr. 8).  She set her belongings down and sat down at the kitchen table.  (Tr. 8-9).  The officers informed her that they had a search warrant in their possession for her residence and that they intended to execute the warrant upon completion of the conversation.  (Tr. 9).  Harris indicated that she understood, and the officers sat down at the kitchen table, Richard to her right and Maynard to her left.  (Tr. 9).  Maynard told Harris that she was not in custody, that she was free to leave at any time, that she was not compelled in any way to speak with him, and that, regardless of any statements she made in the ensuing conversation, she would not be taken into custody.  (Tr. 11).  However, Maynard did not give Harris the <u>Miranda</u> warnings.  (Tr. 12).[3]

At first, the officers spoke to Harris in general terms about her knowledge of the threatening letters and e-mails sent to the EDD.  (Tr. 17).  They then spoke to her about some of her frustrations and issues that she had experienced with EDD relating to Workmen's Compensation and reasonable accommodation.  (Tr. 17).  Subsequently, the officers asked defendant whether she was the person responsible for sending the threatening letters and e-mails.  (Tr. 17).  Maynard testified that, for the most part, every time defendant was confronted with a particular fact

---

[3] Maynard testified that he did not give Harris the <u>Miranda</u> warnings because (1) they were in her home; (2) he told her she was not being taken into custody; and (3) they had no intention of taking her into custody regardless of what she said during the interview.  (Tr. 12).

4

1  or question, defendant denied involvement. (Tr. 17). The
2  officers would try to refute her denial "by giving her insights
3  into some of the information" they had gathered during the course
4  of their investigation and by letting her know that they
5  "strongly believed that she was the person" due to the
6  information they had gathered. (Tr. 17-18). At these points,
7  Harris would become visibly upset, leaning forward with her head
8  down. (Tr. 19, 50). At one point, she appeared to cry and was
9  given some tissues. (Tr. 50). Defendant would then make leading
10 statements, though not direct admissions, that tended to
11 demonstrate that she was the person sending the letters and e-
12 mails. (Tr. 18). The officers then asked clarifying questions,
13 and ultimately, defendant admitted that she was the person
14 responsible. (Tr. 18-19). This happened on multiple occasions
15 and in regards to a number of different issues. (Tr. 19).
16 Eventually, defendant admitted that she had sent the letters, e-
17 mails, and CO2 cartridges. (Tr. 20). The officers then ended
18 the interview. (Tr. 20).

19     The interview lasted approximately two hours and forty
20 minutes. (Tr. 14). During the course of the conversation,
21 Harris was told on at least three to five occasions that she was
22 free to leave and that she was not compelled to speak with the
23 officers. (Tr. 14-15). Maynard also told Harris that she was
24 free to get a drink, use the restroom, or make herself more
25 comfortable. (Tr. 15). Richard testified that while Harris
26 never left the table area, she may have stood up a few times and
27 had something to drink. (Tr. 46).
28 /////

Maynard stated that he maintained a "low-key" approach throughout the interview. (Tr. 20). He testified that although he never yelled at Harris, there were a couple occasions during the course of the interview where his voice became elevated. (Tr. 16). He stated that this occurred when he stopped her from denying conduct by "telling her 'stop' or something of that nature." (Tr. 16). Maynard also testified that he may have raised his hand to indicate that he wanted her to stop her denials. (Tr. 35).

After the conclusion of the interview, Maynard, Richard, and additional personnel executed the search warrant. (Tr. 21). Harris remained seated at the table, requested a paper and pencil, and began writing. (Tr. 21). Maynard informed defendant that she was not compelled to remain at her residence and that she was free to move about. (Tr. 22). After the execution of the search warrant and confiscation of certain items, the officers closed the door and left the premises. (Tr. 24). Harris remained at the kitchen table the entire time. (Tr. 23).

Although the apartment was videotaped both before and after the search for liability purposes, the interview was not videotaped. (Tr. 36). Richard took notes and wrote a report on the interrogation. (Tr. 39). The report does not reflect that Maynard told Harris that she would not be arrested on that day regardless of what she told the officers. (Tr. 39-40).

**ANALYSIS**

Harris moves to suppress all statements made by her during the search of her residence on November 15, 2005 on the grounds that the statements were involuntary and obtained without valid

6

warnings and waiver of rights in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966) ("<u>Miranda</u>").  Thus, the question before the court is whether Harris was "in custody" such that her statements were obtained in violation of <u>Miranda</u>.

"In <u>Miranda v. Arizona</u>, the Supreme Court held that statements that are not the product of interrogation not preceded by appropriate warnings are inadmissible, where the accused was questioned while 'in custody or otherwise deprived of his freedom of action in a significant way.'" <u>United States v. Beraun-Panez</u>, 812 F.2d 578, 580 (9th Cir. 1987) (quoting <u>Miranda</u>, 384 U.S. at 444).  In the Ninth Circuit, a person is "in custody" for purposes of Miranda "when, based upon a review of all pertinent facts, 'a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave.'" <u>United States v. Wauneka</u>, 770 F.2d 1434, 1438 (9th Cir. 1985) (quoting <u>United States v. Booth</u>, 669 F.2d 1231, 1235 (9th Cir. 1981)).  This inquiry is measured by an objective standard.  <u>Beraun-Panez</u>, 812 F.2d at 580.  Moreover, the interpretation of "custody" under <u>Miranda</u> has been "narrowly circumscribed." <u>United States v. Nieblas</u>, 115 F.3d 703, 705 (9th Cir. 1997).

"To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide 'whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." <u>United States v. Kim</u>, 292 F.3d 969, 973 (9th Cir. 2002) (quoting <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994)).  Pertinent facts to consider include: (1) the language

7

1  used to summon the individual; (2) the extent to which the
2  defendant is confronted with evidence of guilt; (3) the physical
3  surroundings of the interrogation; (4) the duration of the
4  detention; and (5) the degree of pressure applied to detain the
5  individual.  Beraun-Panez, 812 F.2d at 580; Wauneka, 770 F.2d at
6  1438.  Other factors may be relevant, or even dispositive of,
7  "the ultimate determination whether a reasonable person would
8  have believed he could freely walk away from the interrogators;"
9  the Beraun-Panez factors simply recur frequently.  Kim, 292 F.3d
10 at 974.

**A.   Language Used to Summon the Individual**

Harris was not summoned to a police station, but rather voluntarily invited the officers into her home after they informed her that they would like to speak to her about the threatening letters and e-mails sent to EDD.  The Supreme Court and the Ninth Circuit have found that suspects were not in custody where the circumstances included volunteering to answer law officers' questions.  Id. (citing California v. Beheler, 463 U.S. 1121, 1125 (1982) (holding that defendant was not in custody when he agreed to accompany police to the station to answer questions and was allowed to leave immediately afterward); Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (holding that defendant was not in custody when he came to the station voluntarily and left 'without hindrance' after 30 minutes of questioning)).

Defendant contends that she did not voluntarily acquiesce to questioning by law enforcement based upon the circumstances under which the officers approached her.  She argues that the officers, wearing badges and firearms, "accosted" her while she was alone

8

1  in the dark at 5:30 a.m.  As such, defendant asserts that the
2  manner in which she was summoned for questioning weighs in favor
3  of suppression.
4     The court disagrees.  The officers conducted surveillance on
5  defendant's home in order to ascertain when she left for work.
6  The officers waited in an unmarked car in defendant's parking
7  lot.  There were no other officers or marked vehicles in view of
8  defendant.  The officers did not approach defendant until they
9  observed defendant leave her apartment and lock her door.  They
10 wore badges identifying themselves as law enforcement, but were
11 otherwise dressed in plain clothes.  The evidence demonstrates
12 that they approached her in a non-threatening (or "low-key")
13 manner and informed her that they would like to discuss the
14 threatening letters and e-mails with her.  Defendant acknowledged
15 this, walked with the officers back to her apartment, and invited
16 them in.  Viewing these facts under the objective, "reasonable
17 person" standard, defendant voluntarily accompanied the officers
18 to her apartment upon request "for the very purpose, known in
19 advance, of answering their questions."  Kim, 292 F.3d at 969.

**B.  Extent to Which Defendant is Confronted with Evidence of Guilt**

22    The testimony of the officers reveals that throughout the
23 interview, defendant was confronted with evidence of her guilt.
24 When asked about the threats, defendant would initially deny
25 involvement.  Subsequently, the officers would tell her to stop
26 the denials, let her know that they had evidence indicating that
27 she was guilty, and continue to press her with clarifying
28 questions.  Eventually, defendant made incriminating statements.

The government contends and the evidence supports that the officers did not use intimidation or fear tactics. However, the point remains that the officers consistently confronted defendant with evidence of her guilt throughout the two hour and forty minute interview.

### C. Physical Surrounding of the Interrogation

Defendant Harris was questioned in her own home. As such, her physical surroundings were familiar and less conducive to coercive interrogation tactics. See Beckwith v. United States, 425 U.S. 341, 346-48 (1976). The Supreme Court has recognized and given great weight to the finding that "the principal psychological factor contributing to successful interrogation was isolating the suspect in unfamiliar surroundings 'for no other purposes other than to subjugate the individual to the will of the examiner.'" Id. at 346 n.7 (quoting Miranda, 384 U.S. at 457). However, the Ninth Circuit has recognized that the consideration of the familiarity of the surroundings in the custodial interrogation context may be neutralized where law enforcement officers take complete control over the environment, creating "a police-dominated atmosphere." See Kim, 292 F.3d at 977-78; Beraun-Panez, 812 F.2d at 582.

Upon reentering her apartment with the officers, she set her belongings down and chose a seat at the kitchen table. Richard and Maynard sat on either side of her. However, there were no other officers present in or visible from the room. Defendant had her cell phone with her. The officers informed her that she was free to get a drink or go to the restroom. They also informed her during the interview that she was free to leave and

10

1  not compelled to speak to them.  Moreover, there is no evidence
2  that the officers took over complete control of the apartment by
3  locking her inside, intentionally isolating her, or subjecting
4  them to their directions, such that they created a "police-
5  dominated" atmosphere that neutralized the familiarity of the
6  location.

**D.   Duration**

The officers interviewed Harris for two hours and forty minutes.  Defendant contends that the length of the interrogation demonstrates that this was a full fledged interrogation that required <u>Miranda</u> warnings, not a brief inquiry.  The government asserts that while the interview was lengthy, defendant was never "detained."

The officers told Harris three to five times during the course of the interview that she was free to leave and not compelled to speak with them.  While the interview could not accurately be described as brief, the Supreme Court has denied suppression of statements made during the course of a three hour interview conducted without <u>Miranda</u> warnings where the circumstances indicated that defendant voluntarily acquiesced to the questioning.  <u>Beckwith</u>, 425 U.S. at 342-44.  As such, the relevance of this factor is dependant upon the court's findings with respect to the other factors relevant in this case.

**E.   Degree of Pressure Applied to Detain the Individual**

Harris was not physically restrained or locked in the room while questioned by the officers.  Moreover, she was told multiple times during the interview that she was free to leave.
/////

11

**F.      Totality of the Circumstances**

Viewing the circumstances of this case as a whole, a reasonable person in defendant's position would not have would concluded that she was not be free to leave or that she was deprived of freedom of action in a significant way.  Importantly, Harris was told at least three to five times during the course of the interview that she was free to leave and not compelled to speak to the officers.  Harris was also told that no matter what she told the officers, she would not be arrested after the interview.[4]  Indeed, after apparently making incriminating statements to the officers, she was not arrested.

It is troubling to the court that the interview was conducted over two hours and forty minutes and that throughout this time, defendant was confronted with evidence of her guilt. However, on balance, the other factors present in this case militate against suppression of the statements.  Defendant was on her way to work when the officers approached her in plain clothes.  She indicated that she understood that they wanted to speak to her about the threatening letters and e-mails and invited them into her apartment.  Defendant chose her seat at the kitchen table.  The officers maintained a "low-key" tone.  Harris was told multiple times that she was not compelled to speak with

---

[4] Defendant asks this court not to credit the officers' testimony that they told Harris she would not be arrested no matter what statements she made because this fact was not set forth in Richard's notes and report.  The court rejects this request and finds the officers' testimony on this point to be credible.

the officers and that she was doing so voluntarily.[5]  Yet, defendant continued to speak to the officers.

Under these circumstances, the court cannot find that this was the type of coercive interrogation by law enforcement, against which <u>Miranda</u> seeks to safeguard.  Furthermore, the evidence does not indicate that defendant was deprived of her freedom in a significant way by the officers.

Defendant relies primarily on the Ninth Circuit's decision in <u>United States v. Kim</u> in arguing that her statements were the statements were involuntary and obtained without valid warnings. 292 F.3d 969.  However, the facts of <u>Kim</u> are readily distinguishable from the circumstances surrounding defendant's statements.  In <u>Kim</u>, the defendant came to the store where police were interrogating her son because she was alarmed that her son did not answer the phone when she called to check on him.  <u>Id.</u> at 974.  The store was surrounded by police cars when she arrived. <u>Id.</u>  She then entered the store, not knowing that the police would want to speak to her.  <u>Id.</u> at 974-75.  The police locked the door after her, preventing her husband who was immediately behind her from entering the store.  <u>Id.</u>  Once inside, her communication with her son was limited or denied, and she was directed to another area of the store where she was questioned. <u>Id.</u> at 971.  Moreover, the police told her only to speak in

---

[5] Defendant contends that a reasonable person would not leave her home unsecured, knowing that the officers would be executing a search warrant.  However, the credible testimony of the officers is that defendant was told that she was free to leave *and* that she was not compelled to speak to them. *Assuming arguendo* that defendant's argument has merit, a reasonable person may have chosen to remain, but not to speak to the officers.

13

English, not Korean, knowing that she had difficulty comprehending English. Id. at 971, 977. They also told her to "shut up." Id. at 971. The police questioned the defendant for fifty minutes. Id. at 977. Under these circumstances, the Ninth Circuit held that the police had created "a police-dominated atmosphere" and that the overall length and manner of questioning supported the conclusion that the defendant was "in custody." Id.

The facts of this case are significantly different from the circumstances present in Kim. In this case, only two officers in plain clothes approached defendant, and no marked police cars were parked in the apartment complex parking lot. Defendant Harris knew that the officers were there to question her about threatening letters and e-mails sent to EDD, and she acquiesced to answering their questions by inviting them into her apartment and sitting at the kitchen table. Once inside, the officers told defendant that she was free to leave and that she was not compelled to speak to them. They also told her that she could get up to get a drink or use the restroom. Defendant also had her cell phone with her at all times. Moreover, the tone of the interview was "low-key" throughout. As such, the coercive and "police-dominated atmosphere" present in Kim was not similarly present in this case.

Therefore, under the totality of the circumstances, the court finds that a reasonable person in defendant Harris' position would have felt free to leave. Accordingly, she was not "in custody" for purposes of Miranda, and her statements made on November 15, 2005 will not be suppressed.

**CONCLUSION**

For the foregoing reasons, defendant's motion to suppress statements made on November 15, 2005 is DENIED.  In light of the this order the status conference set for October 9, 2007 is VACATED.  The court confirms the previously set dates of November 5, 2007 at 10:00 a.m. for a trial confirmation hearing and December 4, 2007 at 9:00 a.m. for a jury trial.

IT IS SO ORDERED.

DATED: October 5, 2007.

_____
FRANK C. DAMRELL, JR.
UNITED STATES DISTRICT JUDGE